RITE–HITE CORP., Acme Dock Specialists, Inc., Allied Equipment Corp., Applied Handling, Inc., Anderson Material Handling Co., Block–Dickson, HMH Co., HOJ Engineering & Sales Co., Johnson Equipment Co., Johnl & Associates, Inc., Keller Equipment Co., Inc., Loading Dock Equipment, Metro Dock Specialists, McCormick Equipment Co., Mid–South Dock Systems, Monohan Equipment Co., Niehaus Industrial Sales, Inc., Northway Material Handling Co., Pemco, R.B. Curlin, Inc., Rice Equipment Co., Stokes Equipment Co., Soper's, Timbers & Associates, Inc., Todd Equipment Corp., Thayer Systems, W.E. Carlson Corp., Plaintiffs,

v.

KELLEY COMPANY, INC., Defendant.

Civ. A. Nos. 83–C–0434, 89–C–0190.

United States District Court,
E.D. Wisconsin.

Oct. 7, 1991.

Gilbert W. Church, Jeffrey N. Costakos, Foley & Lardner, Milwaukee, Wis., and Theodore W. Anderson, Neuman, Williams, Anderson & Olson, Chicago, Ill., for plaintiffs.

Thomas F. Ging, Thomas S. Malciauskas, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., and Glenn O. Starke, George H. Solveson, Andrus, Sceales, Starke & Sawall, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

REYNOLDS, Senior District Judge.

### I. INTRODUCTION

This opinion addresses issues raised in the damages phase of a bifurcated patent infringement action. On March 22, 1983, Rite–Hite Corporation ("Rite–Hite") commenced this action in which it alleges that Kelley Company, Inc.'s ("Kelley") Truk Stop vehicle restraint infringed Rite–Hite's U.S. Patent 4,373,847 ("the '847 patent"). The '847 patent was issued on February 15, 1983, and covers a device for restraining trucks to loading docks during the loading or unloading process.

This action was bifurcated for trial purposes. After a hearing on the issue of liability, this court found on May 29, 1985, that the Kelley Truk Stop's rack-and-pinion mechanism for raising a vertical hook was equivalent to the ratchet-and-pawl mechanism covered by the '847 patent and that

Kelley had therefore nonwillfully infringed the '847 patent. On March 5, 1986, this court issued its findings of fact, conclusions of law, and judgment enjoining Kelley from further infringements and holding Kelley liable to all the plaintiffs for infringement damages plus prejudgment interest. The court found that the Rite–Hite MDL–55 unit, which utilized the patent in suit, was a commercially successful product and that the '847 patent was valid. Finally, this court stayed the injunction pending Kelley's appeal. These rulings were reported in *Rite–Hite Corp. v. Kelley*, 629 F.Supp. 1042, 231 U.S.P.Q. 161 (E.D.Wis.1986), *aff'd*, 819 F.2d 1120 (Fed. Cir.).

On December 2, 1983, shortly after this action was filed, several independent Rite–Hite sales representative organizations ("ISO's") moved to intervene in this case, contending that their "Sales Representative Agreements" and "Dok–Lok Supplement" agreements with Rite–Hite, executed during the pendency of this lawsuit, made them exclusive licensees of the '847 patent. On August 31, 1984, this court permitted the ISO's to intervene in the liability and damages phases of the trial. On February 15, 1989, seven ISO's who had not yet intervened in this action brought a separate action entitled *Block–Dickson, Inc. v. Kelley Co.*, Case No. 89–C–0190 (E.D.Wis.), which was consolidated with this action by stipulation of the parties on April 3, 1989.[1]

With Rite–Hite and the ISO's as plaintiffs, the trial on the damages phase of this action commenced on November 7, 1990, and continued until December 7, 1990. After submitting proposed findings of facts and conclusions of law, the parties presented their closing arguments on December 19, 1990.

Before the court at this damages phase of the litigation are the following primary issues: (1) whether the plaintiff ISO's are entitled to recover damages; (2) whether the plaintiffs have proved that they lost sales on account of Kelley's infringing competition of (a) vehicle restraints and (b) dock levelers; (3) whether plaintiffs have proved lost profits damages to a reasonable probability; (4) whether the plaintiffs may recover lost profits damages under Title 35 United States Code 284 for lost sales of (a) those vehicle restraints not embodying the '847 patent, or (b) dock levelers, which also do not embody the '847 patent; (5) whether plaintiffs are entitled to a reasonable royalty for those lost sales on which they are not awarded lost profits damages, and if so, (6) what royalty rate is appropriate; and (7) what rate of prejudgment interest is appropriate.

For the reasons below, this court awards Rite–Hite as a manufacturer the wholesale profits that it lost on lost sales of ADL–100 restraints, MDL–55 restraints, and restraint-leveler packages on account of Kelley's sale of infringing Truk Stop restraints. This court also awards to Rite–Hite as a retailer and to the plaintiff ISO's reasonable royalty damages on lost ADL–100, MDL–55, and restraint-leveler sales caused by Kelley's infringing sales.

## II. FINDINGS OF FACT

Much of the background of this case is recounted in the trial and appellate opinions on liability issues. That background will be retold and extended in this section only to the extent necessary to convey a complete understanding of issues presented in this damages phase of the case. This section addresses the following topics: (a) parties and jurisdiction, (b) overview of the vehicle restraint and dock leveler market, (c) Rite–Hite's development of vehicle restraints and the significance of the '847 patent, (d) Rite–Hite's marketing of vehicle restraints, (e) Kelley's development and marketing of the infringing Truk Stop restraint, (f) background of the Rite–Hite sales organizations and the exclusivity of their restraint licenses, (g) the period of infringement and the number of infringing units sold, (h) plaintiffs' lost restraint sales,

---

1. The seven ISO's whose case was consolidated with this action were Block Dickson, Inc.; HMH Co.; Mid–South Dock Systems, Inc.; Larry Monohan; Pemco Material Handling, Inc.; Robert Soper Ltd.; and Thayer & Associates, Ltd.

(i) plaintiffs' lost dock leveler sales, (j) plaintiffs' damages, (k) the reasonable royalty rate, and (*l*) plaintiffs' claims for lost profits due to price cuts on actual sales.

## A. *Parties and Jurisdiction*

Plaintiff Rite–Hite is a Wisconsin corporation with its principal place of business at Brown Deer, Wisconsin. Rite–Hite is the exclusive licensee of the '847 patent, and owner, by assignment, of all causes of action and claims for relief arising out of any infringement of that patent. The other plaintiffs are independent Rite–Hite sales organizations (ISO's) with principal places of business located throughout the country.[2] Defendant Kelley is also a Wisconsin corporation having a principal place of business at Milwaukee, Wisconsin.

The court has subject matter jurisdiction over this action under 28 U.S.C. § 1338(a), and this court is the proper venue under 28 U.S.C. § 1400(b).

## B. *Overview of the Vehicle Restraint and Dock Leveler Market*

Both Rite–Hite and Kelley manufacture "vehicle restraints" and "dock levelers." "Vehicle restraints" secure trucks to loading docks to prevent accidental departure from the dock during the loading or unloading process. "Dock levelers" are devices that automatically or semi-automatically bridge the gap between a truck and a dock so that forklift trucks can safely pass over that gap during the loading or unloading process. Dock levelers, in general, have replaced the loose plates that were often used when loading and unloading was accomplished manually (Findings of Fact, Mar. 5, 1986 Decision and Order on Liability ("Findings of Fact"), ¶ 9). By the time that Rite–Hite began to develop vehicle restraints, it had already established itself as a manufacturer of dock levelers.

Rite–Hite and Kelley are both pioneers in the dock leveler business and for many years have been the primary competitors in that business. They both have strong distribution systems, and the two firms dominate their industry. During the period of infringement, they accounted for more than 80% of all dock leveler and 95% of all vehicle restraint sales (Nov. 7, 1990 Trial Testimony of Rite–Hite President Mike White ("Mike White")).

For years, manufacturers and users of dock levelers as well as regulatory agencies recognized the dangers inherent in the accidental separation of trucks from loading docks during the loading or unloading process. Such separation creates a gap between the truck and dock through which a forklift operator and his forklift can fall to the driveway below (Findings of Fact, ¶ 10). Such accidents can be catastrophic (*Id.*).

The American National Standards Institute (ANSI) Safety Committee MH14 addressed this danger during its October 1975 meeting (*Id.* ¶ 14). Specifically, ANSI considered whether "safety legs," Rite–Hite–manufactured devices which limited the extent to which the dockboard could extend, should be sold as required equipment along with levelers (*Id.* ¶¶ 14, 16). At that meeting, Arthur K. White, father of Mike White and the founder of Rite–Hite, proposed to eliminate the problem of accidental truck separation by developing a vehicle restraint device that would physically hook trucks to loading docks (*Id.* ¶ 16). Such devices did not yet exist at the time, and the only existing solutions to the inadvertent truck separation problem, wheel chocks and "communication" systems, were generally ineffective (*Id.* ¶ 16).

## C. *Rite–Hite's Development of Vehicle Restraints and the Significance of the '847 Patent*

Rite–Hite spent nearly five years developing its first commercially successful ve-

**2.** The sales organizations owned by Rite–Hite are referred to as "Rite–Hite owned sales organizations." The sales organizations that marketed Rite–Hite products but were not owned by Rite–Hite are referred to as "ISO's" (independent sales organizations). These two classes of sales organizations are collectively referred to as "Rite–Hite sales organizations" or occasionally (in Rite–Hite documents) as "Rite–Hite sales representatives." This opinion uses the term "sales organization" rather than "sales representative" in order to distinguish the organizations from the salespeople/sales representatives whom they employ.

hicle restraint (*Id.* ¶ 17). Rite–Hite's vehicle restraint development program was arduous and involved many discarded designs (*Id.* ¶ 18). Rite–Hite developed its first vehicle restraint, which was never marketed, by 1977 (*Id.*). By continually researching new restraint designs, Rite–Hite gradually developed restraints that were less expensive, less obtrusive, and less vulnerable to being damaged by vehicles than their predecessors (*Id.* ¶ 19). By the spring of 1978, Rite–Hite developed a vehicle restraint which was mounted on the vertical face of a dock and which utilized a pivoted hook design (*Id.* ¶ 20). Rite–Hite eventually developed a pivoted hook design that functioned by rotating upward to engage the truck's Interstate Commerce Commission bar ("ICC bar") and that was operable either manually or automatically (*Id.*).

In April 1980, Rite–Hite introduced its first restraint, the Automatic Dok–Lok model 100 ("ADL–100") (*Id.* ¶ 37). This device functioned automatically, contained an adjustable trapezoidal carriage to accommodate ICC bars of different heights, and used a rotating or "pivoted hook." The ADL–100 was covered by Rite–Hite patents other than the '847 patent in suit (*Id.* ¶¶ 17–23).

Following the introduction of ADL–100, Rite–Hite continued to develop restraints (*Id.* ¶ 24). At the time it sought primarily to develop a simplified and less expensive restraint that was capable of manual operation (*Id.*). In the spring of 1981, one year after the introduction of the ADL–100, Rite–Hite employees Steven Hipp and Norbert Hahn developed the first of Rite–Hite's Manual Dok–Lok ("MDL") vehicle restraints, which incorporated the releasable locking device covered by the '847 patent (*Id.* ¶ 25). The inventors filed their patent application in the U.S. Patent and Trademark Office on May 4, 1981, and the '847 patent was issued on February 15, 1983.

During the late summer of 1981, Rite–Hite introduced the MDL–55 unit ("MDL–55") (*Id.* ¶ 38). This model featured the vertically moving, releasable hook technology covered by the '847 patent in suit (*Id.* ¶¶ 24–25). This court found following the liability trial that the vertically moving hook assembly covered by the '847 patent was "a new departure from and an improvement over previous 'pivoted hook' designs," the design used in the Rite–Hite ADL–100 (*Id.* ¶ 30). This court found the '847 technology to be superior to the "pivoted hook" design in several ways: (1) the '847 technology resulted in a better range of engagement and larger "capture area," (2) it required a smaller sweep or clearance, and (3) it avoided the tendency of the pivoted hook to rotate away from the ICC bar (*Id.*).

This court therefore concluded following the trial on liability that: (1) the '847 patent represented a "significant advance in the art" whose commercial success was "manifest," (Conclusions of Law, ¶¶ 113–14), (2) the '847 patent was a significant cause for the commercial success of both the Rite–Hite MDL–55 and the Kelley Truk Stop (Findings of Fact, ¶¶ 34, 67), and (3) the claims and value of the '847 patent were not limited to the simplicity of its construction or the possibility of manual operation (*Id.* ¶¶ 30, 80).

The list price of the MDL–55 ranged from only one-half to one-third the list prices of the ADL–100 and the Kelley Truk Stop restraints during the period of infringement, primarily because it did not contain a motor (*See* Plaintiffs' Damages Trial Exh. ("PDTX") –33; Testimony of Mike White). Nonetheless, the MDL–55 offered some advantages over the ADL–100 in that it used the advanced releasable, travelling hook technology provided by the '847 patent.

### D. *Rite–Hite's Marketing of Vehicle Restraints*

The vehicle restraint has proved to be a very profitable product for Rite–Hite and for the Rite–Hite ISO's (Testimony of Mike White & Michael Belcher, co-owner of ISO Todd Equipment Corp.; *see* PDTX–21). Rite–Hite consistently earned its highest profit margins on its restraint devices (Testimony of Mike White).

Rite–Hite initially developed and marketed restraints as safety devices which would pay for themselves by preventing costly accidents (*Id.*). Rite–Hite later attempted to sell restraints as devices that would reduce loading-dock costs by eliminating the time-consuming wheel-chocking process (*Id.*).

In addition to using these new sales tactics, however, Rite–Hite also found that it needed to employ a new basic marketing strategy in order to market restraints effectively (*Id.*). Prior to the introduction of the vehicle restraint, Rite–Hite salespersons typically waited for new construction projects to develop and then made bids on the projects (*Id.*). With the vehicle restraint in its product line, however, Rite–Hite attempted to introduce the vehicle restraint concept to potential customers by arranging meetings, sometimes over a several-month period, with the customer's high-level manufacturing, traffic, and safety personnel (*Id.*). Rite–Hite generally did not make immediate sales with this "deep-selling" strategy, but it sometimes won restraint sales at a later date when the customer finally decided to retrofit existing docks with restraints. (*Id.*).

Rite–Hite claims that this long-term marketing approach made it particularly vulnerable to Kelley's infringement (*Id.*). Rite–Hite showed that its representatives in many cases made the initial presentation of the restraint concept to the customer, only to have a Kelley representative snatch away the sale in the end by offering a lower-priced Truk Stop unit (*Id.*). Rite–Hite was able to retain a large market share despite the infringing competition, but as discussed below, plaintiffs did lose numerous sales on account of Kelley's infringing competition. The plaintiffs failed to demonstrate convincingly, however, that it was Kelley's infringing competition alone that caused them to make the price cuts that they attribute to Kelley's infringing competition.

E. *Kelley's Development and Marketing of the Infringing Truk Stop Restraint*

When Kelley first confronted Rite–Hite's ADL–100 restraint, it downplayed the sig-nificance of the restraint concept by focusing its efforts on developing communication-type devices and other alternative solutions to loading dock hazards. (*Id.* ¶ 37). By 1981, however, Kelley representatives recognized that Rite–Hite restraints were achieving marketplace acceptance and demanded that Kelley develop a vehicle restraint of its own (*Id.* ¶ 39). These representatives were concerned not only that Kelley was missing the boat in the restraint market, but also that Kelley was losing dock leveler sales to customers who sought restraint-leveler packages. (*Id.*).

At trial, Kelly denied that its decision to develop its infringing Truk Stop unit was motivated by a fear of losing leveler sales. Numerous Kelley documents written around the time that Kelley developed the Truk Stop belie Kelley's claim. On November 13, 1981, John Hogseth, Kelley's Vice President of Marketing ("Hogseth"), wrote a memorandum ("Hogseth memorandum") to Joseph Driear ("Driear"), Kelley's Director of Engineering, requesting Driear to develop a vehicle restraint that would be competitive with Rite–Hite's restraints. (*Id.* ¶ 41; PDTX–32).

The Hogseth memorandum underscores that Kelley developed the Truck Stop, at least in part to avoid losing associated leveler sales. The memorandum states:

> Although we haven't completed a full analysis of our past and projected losses in dockleveler sales due to our inability to meet increasing owner specifications for this [restraint] product, please begin an engineering feasibility study to allow introduction of such a product by June 1, 1982, if possible.

(PDTX–32).

Driear responded that he would comply with Hogseth's request, but indicated that he needed a picture and samples of Rite–Hite's new MDL–55 Dok–Lok restraint (Findings of Fact ¶ 42). On the next day, Driear reviewed copies of various Rite–Hite patents, including the patent claiming the ADL–100 restraint (*Id.*).

On December 30, 1981, Kelly purchased and installed at its Tuf–Seal subsidiary one

of the first MDL–55 units sold (*Id.* ¶ 48). Kelley engineers immediately began to inspect, disassemble, measure, operate, and photograph it (*Id.*). By this time, Kelley had obtained all information available about the construction and operation of the MDL–55. (*Id.* ¶¶ 48–49). Although Kelley had examined the ADL–100 in developing its Truk Stop unit (Findings of Fact, ¶ 34), Kelley advanced its research efforts most significantly by examining the MDL–55:

> The evidence at trial, both through the testimony of Kelley's personnel and its documentation, shows that Kelley had given a great deal of thought to the question of a product that would compete with Rite–Hite's vehicle restraint, and that Kelley had made little progress in its own efforts to come up with a competing device until after its engineers had the benefit of the MDL–55 Dok–Lok brochures and inspected, tested, and dismantled an actual MDL–55.

(*Id.* ¶ 55). Although the MDL–55 devices were marked "patent pending" at that time, Kelley did not attempt to determine what patents might issue on the MDL–55 (*Id.* ¶ 42).

By January 12, 1982, Kelley completed the first of its sketches of Kelley's Truk Stop device, which embodied all of the features claimed in '847 patent claims 1, 2, 3, 8, 12, and 13, including the vertically travelling hook technology covered by the '847 patent. These first sketches show the infringing product that Kelley eventually marketed as the Truk Stop (*Id.* ¶ 51). This court concluded at the liability trial that the Kelley Truk Stop infringed the '847 patent embodied in the MDL–55 device (*Id.* ¶ 73).

Although the Kelley Truk Stop infringed the '847 patent embodied in the Rite–Hite MDL–55 unit, the record makes clear that Kelley intended the Truk Stop to compete with Rite–Hite's ADL–100, which was introduced earlier than the MDL–55 and which proved to be more commercially successful than the MDL–55 (PDTX–32; Kelley's Proposed Findings of Fact ¶ 16). The Kelley Truk Stop employed an electric motor and functioned automatically, like the Rite–Hite ADL–100 unit, and unlike the manually-functioning MDL–55 (*Id.* ¶ 9). The list price of the Kelley Truk Stop was also closer to that of the ADL–100 than the MDL–55 throughout the period of infringement (PDTX–33).

Thus, Kelley developed its Truk Stop restraint both in order to capture part of the newly-developed restraint market and to avoid losing leveler sales. Moreover, the features and pricing of the Kelley Truk Stop indicate that the unit was intended to compete primarily with the ADL–100 rather than the MDL–55. Rite–Hite's lost sales figures confirm that the Kelley Truk Stop did in fact cause Rite–Hite to lose significantly more sales of the ADL–100 than the MDL–55 (PDTX–3).

### F. Background of the Rite–Hite ISO's and the Exclusivity of their Restraint Licenses

For the reasons below, this court finds that both the Rite–Hite owned sales organizations and the ISO's are exclusive licensees of the '847 patent.

### 1. Background of the ISO's

Rite–Hite distributed all its products during the period of infringement through Rite–Hite sales organizations (Testimony of Mike White). Each organization sold a variety of products manufactured by Rite–Hite and other firms at retail prices. These additional products included "dock seals" and "dock shelters," which products were not manufactured by Rite–Hite but were frequently sold in contractual "packages" along with Rite-Hite vehicle restraints and levelers (*Id.*). The sales organizations had substantial and permanent places of business and offered installation, repair, and maintenance for the products they sold (*Id.*).

Rite–Hite owned and operated several Rite–Hite sales organizations throughout the period of infringement (*Id.*). During that time, all of the assets of those Rite–Hite owned sales organizations which had been established as separate wholly-owned subsidiaries or were otherwise acquired were transferred to Rite–Hite Corporation (*Id.*). Thereafter, all Rite–Hite owned sales

organizations operated as a division of the Rite–Hite Corporation under the name "Arbon Equipment Corporation." The Rite–Hite owned sales organizations accounted for approximately 30 percent of the retail dollar sales of Rite–Hite products, and the ISO's accounted for the remaining 70 percent during the period of infringement (*Id.*)[3]. Only the ISO's are plaintiffs along with Rite–Hite in this action. Rite–Hite itself is suing for its lost profits at the wholesale level and for the lost retail profits of Rite–Hite owned sales organizations. The ISO's are suing only for their lost retail profits.

Rite–Hite assigned each sales organization an exclusive territory in order to prevent Rite–Hite sales representatives from competing with one another (Testimony of Mike White). Where sales efforts were made by more than one Rite–Hite sales organization in more than one exclusive territory, the profits on the resulting sale were shared according to Rite–Hite's "split commission" rules (*Id.*). These rules applied to both the independent and to the Rite–Hite owned sales organizations (*Id.*). This court finds that these split commission rules are not inconsistent with the finding that the ISO's enjoyed exclusive territorial rights with respect to vehicle restraint products.

Rite–Hite gave the ISO's the option of either having Rite–Hite invoice the customers or paying Rite–Hite for the products and invoicing the customers themselves. If the ISO's elected to invoice the customers themselves, they received a slightly more favorable price from Rite–Hite (*Id.*). Rite–Hite invoiced slightly more than half of the sales of the Rite–Hite ISO's during the period of infringement. Rite–Hite also published Rite–Hite's prices and distributed them to the organizations, after consulting with its "dealer representative counsel," an organization representing the ISO's (*Id.*). Mike White testified that Rite–Hite expected the ISO's to abide by the prices published by Rite–Hite (*Id.*) ISO's which engaged in unauthorized price cutting were occasionally penalized twenty percent of their commissions on the unauthorized sales (*Id.*).

## 2. The Exclusivity of ISO Vehicle Restraint Licenses

Rite–Hite assigned to each ISO a virtually exclusive right to sell Rite–Hite dock products within a specified territory (PDTX–61). Specifically, Rite–Hite promised "not to appoint any other sales representative [organization] in the [t]erritory so long as, in [Rite–Hite's] good faith judgment, [the sales] representative [organization] is doing an adequate job in that entire [t]erritory for all listed products" (Rite–Hite Sales Representative Agreement ¶ 3, in PDTX–29 and DTX–547). Rite–Hite reserved to itself, however, a nonexclusive right to make direct sales within the assigned territory to the "motor freight industry, governmental agencies and government contractors." (*Id.*) The agreement also limited the authority of the ISO's to that of soliciting contracts for sale of Rite–Hite products for final approval by the Rite–Hite "home office" (*Id.* ¶ 4).

During 1983, Rite–Hite executed with each of the ISO's a supplementary agreement to the basic sales representative agreement (PDTX–61). That supplementary agreement, the "Dok–Lok Supplement," expressly added to the ISO's product line:

[A]ll products manufactured and sold by [Rite–Hite] under the name "Dok–Lok" and all other products manufactured or sold in the future by [Rite–Hite] ... embodying any of the claims set forth in the Rite–Hite patents relating to "Dok–Lok" devices, *including (but not by any way of limitation) U.S. Patent No. 4,373,847.*

(Dok–Lok Supplement to Rite–Hite Sales Representative Agreement, ¶ 1, in PDTX–30 (emphasis added)). The supplement further provided that the ISO's right to sell

---

**3.** Rite–Hite owned the following sales organizations during the period of infringement, which it operated as retail divisions under the name of the Arbon Equip. Corp. and the names of: Acme Fox, California Dock Specialists, Inc., Equip- ment Systems, Inc., Government Contracts (a division of Rite–Hite), Great Northern Industrial Products, King Industries, Inc., Mid Atlantic Dock Specialists, Inc., Penn Dock Specialists, and Stordox.

Rite–Hite's patented restraint devices was virtually exclusive:

> Representatives shall have the *exclusive* right in the territory defined in the Sales Representative Agreement between [Rite–Hite] and Representative to sell and to solicit the sales of all of [Rite–Hite's] products embodying the Dok–Lok device patents, except products sold to the motor freight industry.

(*Id.* ¶ 2 (emphasis added)). This agreement remained in effect throughout the period of infringement.

A group of ISO's filed for leave to intervene on December 2, 1983, and this court granted their motion by marginal order on December 30, 1983. Kelley then filed a motion to reconsider and a brief opposing the ISO's intervention. On August 31, 1984, this court denied Kelley's motion to reconsider, finding that the ISO's had a "sufficient, legally recognized interest in the rights secured by the patent to warrant participation." (Aug. 31, 1984 Decision and Order at 2, quoting *Waterman v. Mac-Kenzie*, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891)). This court concluded that the ISO's were exclusive licensees, because they possessed the right to exclude others from selling the Dok–Lok in their respective territories. This court found that Rite–Hite's reservation in the sales representative agreement of a nonexclusive right to sell to government agencies and government purchasers did not apply with respect to Dok–Lok sales, because the Dok–Lok agreement, which superseded the earlier sales representative agreement, did not include such a reservation (*Id.* at 3)[4]. This court also found that Rite–Hite's reservation in the Dok–Lok supplement of the right to make direct sales of Dok–Lok restraints is limited to purchasers in the motor freight industry, which is an insignificant market for Rite–Hite products. (*Id.*) Finally, this court found that the provision permitting Rite–Hite to approve the ISO's sales did not reduce the ISO's legal interests in the '847 patent, because the court found that (1) the provision merely permits

Rite–Hite to check the credit of potential customers and (2) the ISO's are permitted to purchase Dok–Loks from Rite–Hite and to resell them under their own names. (*Id.*)

Kelley has not specifically challenged the validity of the Dok–Lok supplement, nor has it pointed to new agreements or case law that would alter this court's earlier conclusion that the ISO's are exclusive licensees. Instead, Kelley reiterates its earlier argument that Rite–Hite's right to sell to the motor freight industry defeats a finding of license exclusivity. Second, Kelley argues that Rite–Hite's publication of price lists necessarily implies that the ISO's are mere agents and not exclusive licensees. Kelley reasons that Rite–Hite's publication of price lists would constitute resale price maintenance in violation of applicable antitrust law, unless the ISO's are considered to be agents rather than exclusive licensees.

■ Kelley's first argument is unpersuasive. Mike White gave uncontroverted testimony that the motor freight market was throughout the period of infringement and has remained an insignificant and relatively unprofitable market for Rite–Hite products, including vehicle restraints. He also testified that Rite–Hite retained the right to make direct sales to motor freight customers only because the ISO's had historically been unable to service that market profitably (*Id.*). This unrebutted testimony confirms this court's earlier finding that Rite–Hite's reservation of a nonexclusive right to sell to this industry does not defeat the exclusivity of the ISO's '847 license.

■ Nor is this court persuaded by Kelley's second argument that the ISO's must be considered as agents, given Rite–Hite's publication and occasional enforcement of its suggested price list. Whether Kelley is correct in claiming that it is a violation of the antitrust laws for a patentee-manufacturer to fix the resale prices of its sales organizations unless the organizations are

---

**4.** This court now additionally finds that the Dok–Lok supplement also supersedes the right that Rite–Hite reserved in the original sales representative agreement to make direct sales to other unspecified purchasers.

the manufacturer's agents has not been litigated in this case. This court declines to recharacterize Rite–Hite's agreements with the ISO's and thereby diminish the rights of the ISO's, in order to make Rite–Hite's pricing practices appear more benign under the antitrust laws when the antitrust implications of Rite–Hite's pricing practices are not before this court.

This court therefore reiterates and extends its August 31, 1984 conclusion that the ISO's have a "sufficient, legally recognized interest in the rights secured by the ['847] patent," by finding that, under the express terms of the Dok–Lok supplement, the ISO's are exclusive licensees of the '847 patent and all other Rite–Hite vehicle restraint patents, including the patents covering the ADL–100 unit.

### G. The Period of Infringement and Number of Infringing Units Sold

Kelley began selling the Truk Stop in July 1982, about seven months before the '847 patent issued. The period of infringement began with the issuance of the '847 patent on February 15, 1983. This court did not enter a preliminary injunction barring Kelley from selling the Truk Stop, and Kelley continued to sell Truk Stops pending the outcome of the liability trial. Notably, Kelley also continued to sell Truk Stops after the liability trial while the appeal was pending. When the United States Court of Appeals for the Federal Circuit ("Federal Circuit") affirmed this court's finding of liability on April 30, 1987, Kelley ceased producing and selling the infringing Truk Stop.[5] The period of infringement thus extended from February 15, 1983, to April 30, 1987.

Although Kelley estimates that it sold only 3,765 infringing Truk Stop units, this court finds Rite–Hite's figure of 3,825 infringing sales to be more accurate. Kelley's estimate, set forth in a document that Kelley sent to Rite–Hite in 1987 for settlement purposes, was not authenticated by any witness and was not shown to have

been based on Kelley's ordinary business records (*See* Defendant's Trial Exh. ("DTX") –586). In contrast, Rite–Hite's figure, is documented in PDTX–3 and the "individual claim volumes" supporting that exhibit. These individual backup claim volumes contain Truk Stop invoices that Kelley furnished to Rite–Hite. Kelley did not challenge the occurrence of any of the particular sales listed in Rite–Hite's backup volumes and summarized in PDTX–3. This court therefore finds that Kelley sold 3,825 infringing Truk Stop units during the period of infringement.

### H. Plaintiffs' Lost Restraint Sales

For the purpose of determining plaintiffs' lost profits damages, this court finds that, in the absence of Kelley's infringing Truk Stop competition, the plaintiffs would have sold 3,243 additional ADL–100 vehicle restraints and 80 additional MDL–55 restraints for a total of 3,323 additional restraints (PDTX–3).

#### 1. Admissibility and Relevance of Plaintiffs' Evidence of Lost Restraint Sales

Plaintiffs' summary exhibit PDTX–3 summarizes plaintiffs' lost sales claims and traces them back to specific transactions. The specific "lost sales" are more fully documented in plaintiffs backup claim files ("claim files") supporting PDTX–3. This court has considered Kelley's objections to PDTX–3 and the claim files and finds that PDTX–3 and the claim volumes are admissible and provide adequate proof of plaintiffs' claims for the reasons given below.

Each of plaintiffs' claim files contains several documents pertaining to a single transaction or series of transactions with a single customer. The files include deposition testimony from a member of a Rite–Hite sales organization regarding a sale that Rite–Hite claims to have lost on account of an infringing Kelley sale. The files also include "projection" forms summarizing the data in depositions. Accord-

---

5. By April 30, 1987, Kelley had developed and was selling other restraint models which Rite–Hite claims also infringe Rite–Hite patents in another lawsuit, *Rite–Hite Corp. v. Kelley Co., Inc.,* Case No. 89–C–1274 (E.D.Wis. filed October 13, 1989) (stayed pending outcome of this case).

ing to plaintiffs' expert witness, accountant Ronald Beckman, every claim file regarding transactions in which plaintiffs seek lost profit damages contains testimony that: (1) prior to the Kelley sale, Rite–Hite salespersons had solicited the Kelley customer for Rite–Hite vehicle restraints, and (2) vehicle restraints from other manufacturers had not been bid or had been ruled out by the customer because of perceived product problems. Some of the backup files also contain testimony to the effect that the Kelley Truk Stop purchasers were interested in Rite–Hite restraints and levelers, but that they purchased from Kelley solely on the basis of price. PDTX–143 specifically itemizes 169 cases in which plaintiffs' salespersons testified that they had initially convinced the customer to purchase a restraint before the customer ultimately purchased from Kelley.

■ Kelley objected to plaintiffs' backup claim files on the ground that they contain inadmissible hearsay testimony. Specifically, Kelley argued that the testimony of the salesperson-witnesses describing customer motives for purchasing the Kelley Truk Stop should be excluded as hearsay. At trial, this court overruled Kelley's hearsay objection, reasoning that the customer statements to the salespeople were admissible under the "state of mind" exception to the hearsay rule. This exception, as set forth in Fed.R.Evid. 803, provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> **(3) Then existing mental, emotional, or physical condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to

the execution, revocation, identification, or terms of declarant's will.

Based upon the testimony of Michael Belcher, co-owner of ISO Todd Equipment Corp., about the timing of the customer statements, this court found at trial that the customers' statements concerning their purchasing motives were made "substantially contemporaneously" with the customers' decisions to purchase Kelley units. This court therefore ruled that the customer statements were admissible under Fed. R.Evid. 803(3).[6]

■ This court notes that evidence of customer motives is highly relevant to the issue of whether to award lost profits damages, because this court must determine the extent of competition that a customer perceived on a particular bid. *See, e.g., Kori Corp. v. Wilco Marsh Buggies & Draglines,* 761 F.2d 649, 653, 225 U.S.P.Q. 985 (Fed.Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). In *Kori,* the court upheld the district court's award of lost profits damages, based upon the district court's finding that "from *a buyer's perspective,* the only acceptable substitute for the [plaintiff's] patented ... machines were the infringing machines." 761 F.2d at 653 (emphasis added). Thus, evidence of customer purchasing motives is probative of whether purchasers of the infringing Truk Stop perceived the Truk Stop to be the only real alternative to Rite–Hite's restraints.

2. *Reliability of Plaintiffs' Evidence of Lost Restraint Sales*

■ In admitting the salesperson testimonial evidence regarding customer motives, however, the court noted that it would consider the substance of Kelley's various objections to this evidence, including the hearsay objection, in assessing the reliability of this evidence.

Regarding the reliability of the salesperson testimonial evidence, Kelley first argues that plaintiffs have promised the sal-

---

**6.** The "projection sheets," which were authenticated by the witnesses during their depositions, are admissible as summaries under Fed.R.Evid. 1006, which provides that both underlying documents and summaries may be received into evidence. *United States v. Stephens,* 779 F.2d 232, 239 (5th Cir.1985).

espeople whose testimony supports plaintiffs' claims part of any recovery that plaintiffs might obtain in this action. Kelley further argues that the salesperson testimony regarding whether customers would have purchased Rite–Hite products but for Kelley's infringing competition is both speculative and was elicited by leading questions. Kelley argues that plaintiffs prompted their salespersons' deposition testimony by providing the salespeople with "lost sale projection sheets" prepared by plaintiffs' attorneys. Kelley also notes that many of the claim files do not contain records of plaintiffs' bids or do contain bid documents that were prepared by someone other than the testifying salesperson. Finally, Kelley argues that the lost profit claim file was not properly audited by the plaintiffs' accounting expert. Kelley correctly pointed out at trial that the accounting expert merely checked Rite–Hite's arithmetic, but did not question the premises of plaintiffs' claim or independently verify the salesperson testimony. Such accounting analysis was not an "audit" performed according to the Attestation Standards prescribed by the American Institute of Certified Public Accountants (*See* DTX–780, p. 2844). Kelley therefore urges this court to find that the claim files do not show to a reasonable probability that Rite–Hite would have made the claimed lost sales.

This court declines Kelley's request to place little or no weight upon the evidence contained in plaintiffs' claim file, because under the facts of this case, salesperson testimony regarding customer statements is the most reliable type of evidence available. Based upon the in-court testimony of various salespersons, including that of Michael Belcher and W. Michael McKinley, this court finds that salespersons commonly rely upon what the customers tell them. Such evidence of a customer state of mind, as recounted by salespersons, is the most reliable proof of the extent of competition that a customer perceived on a particular bid, absent subpoenaing the customers themselves.

█ This court declines to penalize plaintiffs for failing to subpoena purchasers of the infringing product because: (1) plaintiffs might have lost the good will of the subpoenaed parties, (2) the testimony of these parties would be of dubious competence,[7] and (3) Kelley had an equally good opportunity to depose these Kelley customers in order to refute the testimony of Rite–Hite salespeople.

Moreover, although the salesperson testimony may be "interested" testimony, Kelley has offered no evidence that specifically contradicts it. Kelley has also failed to point out which of the hundreds of claim files are missing bid sheets or even to approximate what percentage of files are missing such bid sheets. This court therefore heeds Kelley's caution that Rite–Hite's claim file has not actually been "audited" in the usual sense, but this court nonetheless accepts the plaintiffs' claim files as reasonably reliable evidence of their lost sales.

The reliability of plaintiffs' proof of lost sales is not as significant an issue as Kelley suggests, however, because plaintiffs' may prove their lost sales through the alternative market share method.[8] The plaintiffs' lost sales estimates, are consistent with the amount of lost sales predicted by the market share method, which is an appropriate alternative means of measuring lost profits damages in this case. This court recognizes the danger in relying upon testimony of potentially interested sales-

---

7. As one commentator notes:
   The ultimate factual issue [regarding lost sales] obviously cannot be proved by direct evidence, for those who elected to do business with the infringer rarely would be willing to testify as to what they would have done if the infringing product or service had not been available from the source they chose, and it is doubtful if such testimony would be competent in any event.

3 R. White, *Patent Litigation: Procedure & Tactics* § 9.03[2] at 9–18.3.

8. *State Industries v. Mor–Flo Industries,* 883 F.2d 1573, 1578, 12 U.S.P.Q.2d 1026 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990). For discussion, *see* section IV. C, *infra.*

people, but it finds the salesperson testimony to be accurate in the aggregate, largely because the lost sales claim based upon this testimony is consistent with the number of lost sales projected by market share analysis.[9]

For these reasons, the plaintiffs' lost sales claim evidence is admissible and reliable.

### 3. *Elements of Panduit Test for Lost Profit Damages* [10]

#### a. Demand for Restraints

This court finds that demand existed for vehicle restraints during the period of infringement as evidenced by the sale of a substantial number of infringing Truk–Stop units.

#### b. Absence of Acceptable Noninfringing Substitutes

■ This court finds that acceptable noninfringing substitutes were unavailable in the specific transactions in which Rite–Hite claims to have lost sales to Kelley. Plaintiffs offered specific testimony indicating that manufacturers other than Rite–Hite and Kelly either were not competing in the transactions at issue or had been ruled out by the customers. Moreover, competitors other than Kelley, Rite–Hite, and Serco (whose restraint infringed a Rite–Hite patent, as discussed below) did not enter the market until late in the period of infringement, and even then, none of these other competitors had a broad distribution network or sold a significant number of restraints (*See* PDTX–35).

Plaintiffs' claim of 3,323 lost restraint sales is corroborated by the market share analysis contained in PDTX–35, the accuracy of which was conceded at trial by Kelley CEO Robert C. Kuhns ("Robert Kuhns"). This exhibit, listing estimated sales of Rite–Hite, Kelley, and other competitors during each year of the infringement period, uses market share analysis to estimate that Rite–Hite lost 2,907 restraint sales.[11] This figure corroborates plaintiffs' claim of 3,323 lost sales reasonably well, particularly because the market share method yields conservative estimates of Rite–Hite's lost sales. The lost sales calculations set forth in PDTX–35 do not consider the Kelley sales in territories of those Rite–Hite ISO's who have not become parties to this lawsuit. Sales lost by those non-party ISO's are included in the claim of Rite–Hite as a manufacturer (*See* PDTX–3), however, causing the market share analysis in PDTX–35 to underestimate Kelley's infringing market share and Rite–Hite's lost sales. The analysis in PDTX–35 further underestimates plaintiffs' lost restraint sales because it erroneously failed to include Serco's infringing sales[12] along with Rite–Hite's restraint sales in calculating Rite–Hite's share of the noninfringing market.[13]

Wheel chocks were not acceptable noninfringing substitutes for the customers who actually chose to purchase the Kelley Truk

---

**9.** *See* text accompanying footnote 11, *infra.*

**10.** *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 197 U.S.P.Q. 726 (6th Cir.1978).

**11.** Plaintiffs projected their lost sales under the market share method by multiplying Rite–Hite's percentage share of the non-infringing market by the total number of Truk Stop units sold. In mathematical terms, market share analysis projects Rite–Hite's lost sales using the following formula: [Rite–Hite sales in units / (industry total restraint sales in units—infringing Kelley sales in units) ] × infringing Kelley sales in units.

**12.** Serco, Inc. was Rite–Hite's principal competitor other than Kelley during the period of infringement. Rite–Hite sued Serco in 1984 for infringement of Rite–Hite patents not at issue in this lawsuit. The action was settled in 1987 with a consent decree that acknowledged the validity of the Rite–Hite patents asserted, acknowledged Serco's infringement of those patents, called for a cash payment to Rite–Hite of $75,000, and granted a royalty-free license to continue selling the Serco AVR–100, –200, and –300 models,. Prior to the agreement, Serco advised Rite–Hite that it would be introducing new models. Since the settlement, Serco has discontinued selling the AVR–100, –200, and –300 models and has introduced two new models of restraints.

**13.** For the proper method of accounting for alternative infringing sales in calculating the patentee's market share, see *State Industries,* 883 F.2d at 1577.

Stop unit. It is true that both wheel chocks and restraints satisfied applicable OSHA regulations (DTX–729), and that the overwhelming majority of loading dock customers still use chocks. Nonetheless, restraints were marketed as cost-saving devices, and many of the customers who actually purchased restraints were undoubtedly persuaded by this marketing approach. By spending several extra thousand dollars to purchase the Kelley Truk Stop restraint rather than simple wheel chocks, the Truk Stop customers demonstrated that chocks did not meet their needs. Accordingly, when a customer specified a need for a "vehicle restraint or equivalent" in a bid, a wheel chock was not considered to be an acceptable substitute (Testimony of Michael McKinley).

Kelley's arguments that many of the Truk Stop purchasers would not have purchased the Rite–Hite ADL–100 is unpersuasive. Kelley did not show that its customers were so loyal, that Kelley's service was so superior, or that the Truk Stop was so much less expensive or better than the Rite–Hite restraints, that the Truk Stop purchasers would not have purchased a Rite–Hite restraint. Such arguments are not patently unreasonable, but they are unsupported by the facts. Kelley offered no customer testimony showing that Truk Stop purchasers would have categorically refused to purchase Rite–Hite products or that the Truk Stop purchasers perceived the Truk Stop to be significantly better than the ADL–100. Kelley also failed to proffer any evidence concerning (1) the average actual price difference between the Kelley Truk Stop and ADL–100 or (2) the price elasticity of demand for restraints held by the Truk Stop purchasers. According to PDTX–33, the list price of the ADL–100, which ranged from $2,500 to $3,000 during the period of infringement, never exceeded the list price of the Truk Stop by more than $300. On the average, the list price of the ADL–100 was only $200 higher than that of the Kelley Truk Stop during the period of infringement (PDTX–33). Although Kelley claims to have offered significant, but unspecified discounts, it failed to show that Truk Stop purchasers would

not have purchased the ADL–100 because of its slightly higher price. This court finds that most customers who are willing to purchase a $2000–$3000 Kelley Truk Stop rather than inexpensive wheel chocks would also be willing to purchase a slightly more expensive ADL–100 restraint.

■ This court also rejects Kelley's argument that Rite–Hite's lost sales figure should be reduced to account for the increase in total market-wide restraint sales that Kelley attributes to its entry into the market. Kelley suggests that its mere presence in the market increased customer acceptance of the restraint concept and thereby indirectly increased market-wide restraint sales, including Rite–Hite's sales. Kelley's argument is resourceful but without factual support.

For the foregoing reasons, this court concludes that Rite–Hite would have made its claimed lost sales but for Kelley's infringing competition.

c. Rite–Hite's Manufacturing and Marketing Capabilities

This court finds that the plaintiffs had the manufacturing and marketing capabilities to exploit the full demand for vehicle restraints during the period of infringement (Testimony of Mike White). Even in 1985, the year in which Kelley sold its greatest number of Truk Stop units, Rite–Hite could have manufactured sufficient restraints to satisfy the demand of the Truk Stop customers by increasing its production by less than twenty-five percent (*Id.*).

d. Plaintiffs' Proof of Lost Profits

See section II.J., *infra*.

4. *Number of Lost Sales Due to Infringement*

For the above reasons, this court finds that, in the absence of Kelley's infringing Truk Stop competition, the plaintiffs would have sold 3,243 additional ADL–100 units, which do not embody the '847 patent in suit, and 80 additional MDL–55 units, which do embody the '847 patent in suit,

for a total of 3,323 additional restraints (PDTX–3). That the plaintiffs claim to have lost far more sales of ADL–100 model vehicle restraints than MDL restraints is reasonable, given that Kelley's Truk Stop restraint was designed and marketed to compete against Rite–Hite's ADL model (*See* PDTX–32 & –33).

### I. *Plaintiffs' Lost Sales of Dock Levelers*

▮ This court finds that in the absence of Kelley's infringing Truk Stop competition, plaintiffs would have sold an additional 1,692 dock levelers in restraint-leveler package sales during the period of infringement. Without the Truk Stop in its product line, Kelley would not have made these leveler sales for the reasons below.

Although both parties sold most of their levelers without restraints (*see, e.g.,* PDTX–3 at 1), the restraint was most useful when used in combination with a leveler (Testimony of Mike White). Following the development of the restraint, loading industry customers frequently solicited package bids for the simultaneous installation of vehicle restraints and dock levelers, especially for new dock installations (*Id.*). Such package bids made it easier for customers to contract with suppliers and to coordinate construction schedules (*Id.*). Restraints installed at new installations were in fact normally installed with levelers (Testimony of Mike White). Customers purchasing restraint-leveler packages almost invariably purchased both items from the same manufacturer (*Id.*). Kelley's November 13, 1981 internal Hogseth memorandum underscores Kelley's early awareness of the linkage between restraint and leveler sales (PDTX–32). Both Rite–Hite and Kelley encouraged this linkage during the period of infringement by offering "combination discounts" on restraint-leveler packages (Testimony of Mike White). Some Kelley representatives further reinforced this linkage by informing customers that Kelley would void warranties for levelers to which a Rite–Hite restraint had been attached (Testimony of Michael Sherrard).

Not surprisingly, of the 3,825 infringing Kelley restraints sold during the period of infringement, 1,692 were sold in restraint-leveler packages (PDTX–3 at 1). This court finds that Rite–Hite could normally have anticipated selling restraint-leveler packages to customers who bought Kelley restraint-leveler packages in transactions in which a Rite–Hite package was bid.

### J. *Plaintiffs' Damages*

Kelley argues that the plaintiffs' damages claims are excessive in that the plaintiffs failed to deduct a sufficient amount of their avoided variable costs from their damages claims. In their joint damage exhibits, the thirty-four plaintiff ISO's estimate that they would have incurred additional incremental expenses amounting to only one percent of the net sales revenue that they would have earned had they made Kelley's infringing sales. Rite–Hite estimates that its own incremental manufacturing costs would only have amounted to .17 percent of the additional net sales revenue that it would have earned had it made the sales it lost to Kelley. Kelley's criticism, based largely upon the testimony of its expert witness Dr. James Adler ("Dr. Adler"), points out the need to deduct from plaintiffs' claims the percentage sales commissions that both the Rite–Hite owned sales organizations and the ISO's avoided having to pay to their salespeople as a result of Kelley's infringement. On this point, the court is persuaded that Dr. Adler is correct.

Rite–Hite has proved its lost profits damages as a manufacturer to a reasonable probability, but Rite–Hite as a retailer and the ISO's have failed to prove their retail damages to a reasonable probability. As discussed below, Rite–Hite as a manufacturer is entitled to lost profits damages, but Rite–Hite as a retailer and the ISO's are entitled only to reasonable royalty damages.

#### 1. *Reliability of Rite–Hite's Claim for Lost Profits at the Wholesale Level*

Dr. Adler criticized plaintiffs' lost profit claim on various grounds. First, Dr. Adler suggested that Rite–Hite's gross profits were not credible, because Rite–Hite's his-

torical gross profit margins were significantly lower than the gross profit margins used to calculate Rite–Hite's damages claim (*See* DTX–572).

Rite–Hite effectively rebutted Dr. Adler's criticism through the testimony of Mark Kirkish ("Kirkish"), the controller of Rite–Hite. Kirkish attributed the discrepancy in gross profit margins to three factors: (1) Rite–Hite had higher profit margins on restraints than on other classes of products, (2) Rite–Hite did not claim damages for lost sales of "options," which generally sold at gross profit margins lower than those for restraints alone, and (3) Rite–Hite was forced to offer price discounts to the ISO's in order to meet Kelley's infringing competition. This court is unpersuaded by Adler's criticism of the gross profit margins included in Rite–Hite's claim, because Dr. Adler failed to rebut specifically any of Kirkish's explanations.

Dr. Adler next compared Rite–Hite's actual operating profits and expenses during the period of infringement to the operating profit and expense estimates in Rite–Hite's claim (DTX–574 & –682). Dr. Adler noted that Rite–Hite earned an eight percent profit on net sales dollars during the period of infringement, but that Rite–Hite assumes in its damages claim that it would have earned a fifty-one percent profit on the net sales dollars that it would have made but for the infringement (*Id.*). Without identifying any specific errors in Rite–Hite's operating profits calculations, Dr. Adler suggested that the discrepancy between the historical and the claimed incremental operating expenses undermined the credibility of Rite–Hite's lost profit claim.

Rite–Hite's expert, accountant Donald Beckman ("Beckman"), an accountant with Coopers & Lybrand, effectively countered Dr. Adler's criticism by offering a reasonable explanation for the differences between Rite–Hite's historical operating expenses and the incremental operating expenses included in Rite–Hite's claim for lost wholesale profits (PDTX–140). Beckman attributed the discrepancies in Rite–Hite's historical and claimed operating expenses to the three factors: (1) one-time expense increases that Rite–Hite incurred in 1986; (2) increases in other expenses that had no relationship to sales, e.g., rent and executive salaries paid to stockholder families; and (3) increases in "stepped fixtures" sales and marketing expenditures that were unrelated to sales. Beckman further suggested that the amount of incremental operating expenses deducted from Rite–Hite's lost profit claim was reasonable because: (1) Rite–Hite had included $95,000 of fixed expenses in its calculation of operating expenses and (2) Rite–Hite's incremental expenses would have been $84,000 less than its actual expenses on account of economics of scale that Rite–Hite would have enjoyed if it had made Kelley's sales. Dr. Adler did not respond specifically to any of Beckman's explanations.

Rite–Hite's other expert, Dr. Rita Cheng, of the University of Wisconsin at Milwaukee School of Business, also criticized Dr. Adler's analysis. First, she noted that Dr. Adler's analysis did not take into account the additional sales expense that Rite–Hite spent in order to meet Kelley's infringing competition. Second, she reiterated Beckman's analysis that some of Rite–Hite's operating expenses were unrelated to sales volume, including, for example, increased expenses incurred by Rite–Hite in connection with its retail operations in 1986 and various "stepped fixed" marketing costs. Third, Dr. Cheng criticized the basic assumption of Dr. Adler's regression analysis that operating costs were completely dependent upon sales. Dr. Cheng noted that sales could equally plausibly be considered to be partially dependent upon sales expenses, and that operating costs should therefore not necessarily be considered a dependent variable and sales should not necessarily be considered an independent variable. Dr. Cheng also noted that the reversal of the dependent and independent variables would cause a regression analysis to yield erroneous statistical results. Dr. Cheng's testimony was impressive, credible, and persuasive, and greatly assisted this court in understanding the parties' use of statistical evidence.

Although Dr. Adler's analysis initially raised questions about the credibility of Rite–Hite's claim for lost profits at the wholesale level, this court finds that Rite–Hite's expert witnesses satisfactorily explained the apparent discrepancies uncovered by Dr. Adler's analysis. As Dr. Adler cautioned, his econometric models could not in themselves project what Rite–Hite's true operating expenses would have been. Further, Dr. Adler did not perform any threshold study to establish the credibility of his assumption that operating costs were entirely dependent upon sales. Therefore, it is almost impossible, based upon Rite–Hite's historical operating cost figures, for this court to determine whether Rite–Hite's claim significantly understates Rite–Hite's incremental operating costs.

■■■ Finally, doubts regarding the precision of the damages are resolved against the infringer, see *Kaufman Co. v. Lantech, Inc.,* 926 F.2d 1136, 1141, 17 U.S.P.Q.2d 1828 (Fed.Cir.1991). Accordingly, Rite–Hite as a manufacturer has met its burden of establishing to a reasonable probability its lost profits at the wholesale level.

2. *Reliability of the Claims of Rite–Hite as a retailer and the ISO's for Lost Profits at the Retail Level*

■■■ This court finds that the sales representatives have failed to prove their lost profits damages to a reasonable probability, because they have failed to deduct avoided percentage sales commissions from their claims.

Dr. Adler questioned the accuracy of the lost profit claims of the ISO's because their claimed operating profits significantly exceeded their historical operating profits. Dr. Adler's analysis compared the historical operating profits and expenses of five of the largest ISO's to the operating profit and expense figures used in the joint damages exhibits of all the ISO's (DTX–576). The five ISO's analyzed by Dr. Adler had an average historical operating profit of approximately five cents for every commission dollar of revenue during the period of infringement, yet request approximately ninety-nine cents in operating profit for every dollar of lost revenue.

The plaintiffs contend that claim files of each sales representative organization demonstrate that (1) the sales organizations would have incurred only minimal incremental expenses on additional sales, and (2) these expenses would have been offset by lost installation income, for which no damages are sought here. Plaintiffs also refer to testimony of Kelley representatives William McAnulty, Gerald Saks, and Michael McKinley, who admitted that many postsale expenses, e.g., site inspection and site preparation, completing documents, and providing usage instructions to customers, were normally covered by separately-billed installation charges. The plaintiffs therefore claim that the deduction of one percent of commission income from their claims adequately covers any additional expenses that the representatives would have incurred if they had made the infringing sales.

Although the lost profit claims of the ISO's and Rite–Hite owned sales organizations need not be reduced to cover installation costs for which plaintiffs normally received separate compensation, these claims must be reduced to cover noninstallation-related costs that the sales organizations avoided by losing sales to Kelley. The most significant of these avoided costs are the percentage sales commissions that the sales organizations' avoided having to pay to their salespeople. This court cannot assume that profits on installation activities would have offset the sales organizations avoided incremental costs, because the sales organizations introduced no evidence on their *net* profits on installation activities. In evaluating the reasonableness of the sales representatives' damages claims, this court analyzes the operating costs of ISO, W.E. Carlson Corp. ("W.E. Carlson").

William Carlson ("Carlson"), who jointly owns ISO W.E. Carlson with his wife, offered three explanations for the apparent discrepancy between the sales representatives' historical and claimed operating costs, based upon his firm's experience (PDTX–135). First, Carlson noted that

W.E. Carlson's historical operating costs included the "sunk" costs that W.E. Carlson incurred in marketing to customers who eventually bought from Kelley. Carlson suggested that these "sunk" costs were directly caused by Kelley's infringement and therefore should not be deducted from the sales organizations' damages claims. Second, Carlson noted that W.E. Carlson's historical operating "expenses" included costs that increased for reasons apart from increased sales, such as annual increases in salaries that the firm paid to Carlson and his wife as co-owners of the business. Third, Carlson pointed out that W.E. Carlson's claimed operating costs were lower than its historical operating costs because the firm did not deduct from its claimed operating costs the percentage sales commissions ("sales commissions") that it and the other sales organizations normally paid to salespeople for making sales. Carlson agreed that these commission expenses varied directly with sales, but he suggested that these expenses are not "avoided" operating costs, because W.E. Carlson and the other independent and Rite–Hite owned sales organizations are "legally obligated" to pay a portion of any damages recovered in this case as "lost commissions" to their salespeople.

These explanations do not satisfactorily explain the discrepancy between the sales representatives' historical and claimed operating costs.

The "sunk" cost phenomenon would explain some undetermined portion of this discrepancy. In addition, "step fixed" costs, such as salaries, which increased independently of sales volume throughout the period of infringement, would explain part of this discrepancy. For example, roughly $168,000, or twenty-five (25) percent, of the $660,000 increase in W.E. Carlson's selling and administrative expenses during the period of infringement was in fact attributable to salary increases (excluding sales commissions),[14] which increases were unrelated to changes in W.E. Carlson's sales volume (Testimony of William Carlson)[15]. Being unrelated to sales volume, such "step fixed" costs would also not properly be deducted from plaintiffs' claims.

Nonetheless, plaintiffs have failed to prove their lost retail profits, because they have failed to deduct sales commission expenses from their claimed operating profits. Such commission expenses are textbook examples of costs which vary directly with sales, and which must therefore must be considered as operating expenses in determining operating profits. Sales commissions were historically significant operating expenses for W.E. Carlson,[16] and W.E.

14. W.E. Carlson's total salary expenses, excluding sales commission expenses, increased each year during the period of infringement, from $310,146 in 1983 to approximately $478,175 in 1987 (PDTX–135 at 2). During this period, W.E. Carlson's total selling and administrative expenses increased each year from a low of $1,003,096 in 1983 to a high of $1,664,081 in 1986, an overall $660,000 increase across this time period (*Id.*). Thus, roughly $168,000, or 25% of the $660,000 increase in W.E. Carlson's operating expenses was in fact attributable to salary increases, which according to Mr. Carlson's testimony were unrelated to sales.

During this period, W.E. Carlson's gross profits on product sales increased each year during the period of infringement, from $725,000 in 1983 to $1,152,057 in 1987, a total increase of approximately $427,000 (*Id.* at 6).

15. Kelley has not argued that the plaintiff sales organizations would not have been able to make the incremental sales at issue without hiring more employees and thereby paying greater salaries. Such an argument would be untenable in any case, because the Rite–Hite actually did make bids in the transactions for which plaintiffs claim lost sales.

16. This court's review of W.E. Carlson's operating expenses confirms that sales commissions (1) were a large component of that firm's operating expenses and (2) explain a significant portion of the discrepancy between W.E. Carlson's historical and claimed operating costs.

In 1983, W.E. Carlson's percentage commission expenses totaled $262,235 out of the firm's total annual selling and administrative expenses of $1,003,096 (PDTX–135 at 1). By 1988, W.E. Carlson's sales commission expenses had risen to $545,078 out of the firms total annual selling and administrative expenses of $1,664,081 (*Id.*). Thus, approximately $283,000, or 43%, of the $660,000 increase in W.E. Carlson's selling and administrative expenses across the period of infringement was attributable to increases in sales commission payments.

W.E. Carlson's gross profits on product sales, which are calculated before selling and adminis-

Carlson and the other sales organizations avoided having to pay these expenses by losing sales to Kelley. The plaintiffs have also failed to demonstrate that they are legally obligated to pay part of their recovery in this case as sales commissions to their salespeople. Accordingly, the independent and Rite–Hite owned sales organizations must deduct avoided sales commission expenses from their lost profits claims.

■ Although the sales organizations' claimed costs should be somewhat lower than their historical operating costs because of the existence of sunk and step-fixed costs, this court cannot estimate the sales organizations' actual operating costs based upon the sales organizations' submissions. The sales organizations have failed to provide this court with any basis for determining the sales commission costs that each organization avoided as a result of Kelley's infringing sales. By not deducting such a significant avoided cost item from their calculation of lost retail profits, the sales organizations have failed to prove their lost retail profits claim to a reasonable probability. Their recovery of lost retail profits is therefore limited to royalty damages amounting to one-third of their claimed lost retail profits.[17]

### 3. *Calculation of Lost Profits*

This court rejects the lost retail profits calculations of the independent and Rite–Hite owned sales organizations, because the plaintiffs failed to deduct avoided sales commissions from their claims. However, this court accepts Rite–Hite's calculation of its lost profits at the wholesale level, as those calculations appear in PDTX–4 and the supporting backup volumes.[18] This court finds that Rite–Hite as a manufacturer incurred the following amounts of lost profits at the wholesale level, excluding interest due to Kelley's infringement of the '847 patent: $3,811,499 lost profits on lost sales of vehicle restraints and $1,233,639 lost profits on lost sales of levelers (PDTX–4 at 36).

### K. *Reasonable Royalty*

■ This court finds that Rite–Hite as a manufacturer is entitled to an award of reasonable royalties on 502 infringing restraint or restraint-leveler sales in which plaintiffs have not proved that they contacted the Kelley customer prior to the infringing Kelley sale (*Id.* at 38). In addition, the ISO's and Rite–Hite as a retailer are entitled to reasonable distribution royalties on all 3,825 infringing restraint and restraint-leveler sales that Kelley made.

On February 15, 1983, the date on which the law presumes the parties to have engaged in a hypothetical royalty negotiation, the '847 patent was a "pioneer" patent whose commercial success was manifest, as reflected in this court's decision on liability (Conclusions of Law, ¶ 114). Kelley's arguments that the '847 patent was valueless without the trapezoidal carriage feature found in the Rite–Hite MDL–55 and that several alternative noninfringing technologies existed during the period infringement are belied by two facts. First, the commercial success of the Kelley Truk Stop, which used the '847 patent without a trapezoidal carriage, demonstrates that the '847 patent had value apart from the trapezoidal carriage. Second, Kelley's continued use of the '847 technology in the Truk Stop for

---

trative costs are deducted, increased of approximately $427,000 across this period (*Id.* at 6). Hence, during the period of infringement, W.E. Carlson's commission expenses increased significantly as gross profits increased—commission expenses increased by $283,000 while gross profits increased by $427,000 during this period.

17. Although any doubts regarding the precision of the damage amount must normally be resolved against the infringer, *see Kaufman Co. v. Lantech, Inc.,* 926 F.2d at 1141, 17 U.S.P.Q.2d 1828, this rule does not apply where the doubts regarding damages arise out of the patentee's

failure to introduce certain evidence that would normally be only within the patentee's control. Here, only the sales organizations had ready access to records of their commission payment practices. The sales organizations have failed to satisfy their burden of providing a reasonable estimate of their lost profits, and are therefore entitled only to reasonable royalty damages. *See Panduit,* 575 F.2d at 1156.

18. PDTX–4 is a recalculation of PDTX–1, incorporating errata sheets PDTX–2B and PDTX–2C.

nearly two years after this court's liability decision suggests that alternative noninfringing hook designs did not abound.

■ The value of the '847 patent was also enhanced by several factors. First, in early 1983 the only vehicle restraints available were Rite–Hite's units and Kelley's infringing Truk Stop (PDTX 35). Plaintiffs would reasonably have demanded a higher royalty when Rite–Hite was the only manufacturer in the restraint market. Second, the plaintiffs would have expected to forego a significant level of profits by granting a license to Kelley, because Kelley was historically a strong competitor in this industry and because plaintiffs anticipated being able to sell a large percentage of restraints in highly profitable restraint-leveler packages (Testimony of George Zahorik; DTX–555 at 3; DTX 556 at 1). Third, Rite–Hite had consistently followed a policy of exploiting its own patents, rather than licensing its patents to competitors (Testimony of Mike White). For these reasons, Rite–Hite would reasonably have insisted upon, and Kelley reasonably would have been willing to pay, a royalty on the '847 patent that would have exceeded the standard royalty rate in the dock industry.

Under these circumstances, this court finds that Rite–Hite would have been willing to grant a competitor a license to use the '847 technology only if Rite–Hite received a royalty equal to no less than one half of the per unit profits that it was foregoing (Testimony of Robert Beart).

This court declines to adopt Kelley's estimate of a reasonable royalty. Kelley attempted to establish a standard royalty rate in the dock industry by referring to several license agreements and settlement agreements. Expert witnesses Thomas Hinkes and Robert Kuhns estimated that a reasonable royalty would range from two to five percent of Kelley's net sales price on the Truk Stop (Testimony of Thomas Hinkes & Robert Kuhns). Hinkes' estimate is unpersuasive because it is based upon Hinkes' experience of negotiating nonexclusive licenses with noncompetitors. Kuhns' estimate is also of limited relevance, because it is based upon royalties contained in settlement agreements. Such settlement-induced royalty agreements are determined largely by factors that are not considered in the "hypothetical royalty negotiation" analysis that this court must perform. In negotiating a settlement, the typical patentee is constrained by the risk and expense of litigating a patent suit. Risk and expense are not factors in the hypothetical royalty negotiation, however, because the patentee is presumed to know that the patent is valid and infringed. Settlement agreements are therefore not an accurate gauge of a reasonable royalty.

■ This court also places little weight upon the royalty rate that Mike White paid for Rite–Hite patents when Mike White bought Rite–Hite from his father. Such an intra-family sale is too dissimilar from this hypothetical situation in which one competitor voluntarily grants a novel license to its primary competitor.

For the foregoing reasons, Rite–Hite would reasonably have anticipated in February 1983 that the '847 patent would prove to be as successful as it actually was. This court therefore finds that in a hypothetical royalty negotiation conducted at that time, Rite–Hite and the plaintiff ISO's would have been able to estimate accurately the profits that they would forego by granting Kelley a license to use the '847 patent for the period of infringement. Kelley's infringement caused Rite–Hite to lose 3,323 Truk Stop sales, 1,692 of which were package restraint-leveler sales; Rite–Hite as a manufacturer thereby lost wholesale profits averaging $1,540.34 per Kelley restraint sale, when Rite–Hite's lost wholesale profits on both restraints and levelers in restraint-leveler packages are taken into account (PDTX–4 at 7). This court finds that Rite–Hite as a manufacturer is entitled to a royalty equal to approximately fifty percent of its estimated lost profits per restraint sale, or a royalty of $770 per restraint on the 502 infringing sales for which Rite–Hite does not receive lost profits damages.

The ISO's and Rite–Hite owned sales organizations claim to have lost $824.19 in

distribution income per infringing sale made in their respective territories (*See* PDTX–4 at 32). This court finds that Rite–Hite as a retailer and the ISO's are entitled to a reasonable distribution royalty amounting to approximately one-third of this amount, or a royalty of $275 per infringing sale. This court has discounted the plaintiffs' lost profits claims by two-thirds in order to deduct an adequate amount of avoided sales commission costs from plaintiffs' claims.[19]

This court finds therefore finds that: (1) Rite–Hite is entitled to manufacturer's royalty of $770 per restraint on the 502 infringing restraint sales for which Rite–Hite is not entitled to lost wholesale profits, amounting to a total of $386,540.00, excluding interest (PDTX–4 at 36); and (2) Rite–Hite as a retailer and the ISO's are entitled to distribution royalties of $275.00 per restraint on all 3,825 infringing Truk Stop sales made during the period of infringement, amounting to a total of $1,051,875.00, excluding interest.

L. *Plaintiffs' Claims for Lost Profits Due to Price Cuts On Actual Sales*

■ This court finds that Rite–Hite as a retailer and the ISO's have failed to prove their claim for lost profits due to price erosion to a reasonable probability. Plaintiffs' damages for price cuts are too speculative, because plaintiffs might have had to make these price cuts even absent Kelley's infringing competition. Moreover, unlike plaintiffs' evidence of lost sales, which is corroborated by market share analysis, plaintiffs' evidence of price erosion is uncorroborated. Plaintiffs are therefore not entitled to recover "price erosion" damages.

## III. CONCLUSIONS OF LAW

### A. *ISO's Entitlement to Damages*

The ISO's are entitled to damages for Kelley's infringement of the '847 patent, because they were exclusive territorial licensees under the '847 patent and all other Rite–Hite vehicle restraint patents, including the patents covering the ADL–100 model vehicle restraint. *See Weinar v. Rollform,* 744 F.2d 797, 806–07 (Fed.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985). In *Weinar,* the Federal Circuit held that both a patentee and an exclusive territorial licensee, "sharing the property rights represented by a patent may have their respective rights protected by injunction and each, when properly joined in a suit, may be entitled to damages." *Id.* at 807. Permitting Rite–Hite and the ISO's to sue for damages is reasonable because the patent interests of all these parties were injured, and this case does not present any danger of multiple recoveries. *See Id.*

This court holds that salespersons employed by the sales organizations are not entitled to recover damages as agents of the exclusive licensee-sales organizations, because no legal authority supports such recovery.

### B. *Rite–Hite's Right to Recover Lost Profits Damages on Lost Sales of Rite–Hite ADL–100 Units*

Kelley concedes that plaintiffs may seek lost profits damages on lost sales of the Rite–Hite MDL–55, because it contains the '847 patent in suit (Kelley's Proposed Findings of Fact and Conclusions of Law, ¶¶ 54, 56). However, Kelley disputes whether plaintiffs may recover lost profits on lost sales of the Rite–Hite ADL–100,

---

19. The amount of this deduction is reasonable, because it is roughly consistent with the commission expenditures that ISO W.E. Carlson probably would have avoided, based upon its historical experience. W.E. Carlson's gross profits on product sales increased by $427,000 during the period of infringement, while commission expenses increased by $283,000 during this period; thus W.E. Carlson's commission expenses increased by approximately 66 cents for every dollar increase in gross profits on

product sales. Although plaintiffs' counsel asserts that not all of the representative organizations paid such commission income (Plaintiffs' Reply Trial Brief at 13 & n. 7), these organizations have not been identified. Moreover, plaintiffs cannot complain that this court has relied unduly upon the cost behavior of this ISO, given that the plaintiffs requested this court to draw general conclusions about the sales organizations' operating profits and expenses based upon W.E. Carlson's cost behavior.

which is covered by Rite–Hite patents other than the '847 patent, and which accounts for the majority of plaintiffs' lost profit claim (*See* PDTX–3). This court has already held that the ISO's and Rite–Hite as a retailer are limited to recovery of reasonable royalty damages on lost retail sales. Thus, the remaining lost profits issue concerns whether Rite–Hite as a manufacturer may recover lost wholesale profits damages for lost sales of the ADL–100, a product not containing the patent in suit. This court concludes that 35 U.S.C. § 284 entitles Rite–Hite to recover such lost wholesale profits.

### 1. Standard for Recovery of Lost Profits Damages

A patent confers upon the patentee, for the statutory period, the right "to exclude others from making, using, or selling the invention...." 35 U.S.C. § 154. Pursuant to 35 U.S.C. § 284, a patent owner whose patent has been infringed is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." In *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964), the Supreme Court established the proper method for calculating damages under § 284:

> [Damages under 35 U.S.C. § 284] constitute "the difference between [the patent holder-licensee's] pecuniary condition after the infringement, and *what his [pecuniary] condition would have been if the infringement had not occurred.*" The question to be asked in determining damages is "... primarily: had the [i]nfringer not infringed, what would [p]atent [h]older-[l]icensee have made?"

(citations omitted) (emphasis added) (first quoting *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 552, 6 S.Ct. 934, 942, 29 L.Ed. 954 (1886); second quoting *Livesay Window Co. v. Livesay Ind., Inc.*, 251 F.2d 469, 471 (5th Cir.1958)). *See also Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1064, 219 U.S.P.Q. 670 (Fed.Cir.1983). In

holding that § 284 ordinarily authorizes the award of prejudgment interest, the Supreme Court in *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1982) emphasized that "Congress' overriding purpose [in § 284 was to afford] patent owners complete compensation." *Id.* at 655, 103 S.Ct. at 2062. Thus, the Supreme Court has consistently interpreted § 284 as authorizing damages awards sufficient to compensate the patentee for all the monetary losses that he has suffered as a result of infringement.

The Federal Circuit has accordingly instructed that lost profits are the preferred measure of the damages under § 284:

> The general rule for determining the actual damages to a patentee that is itself producing the patented item, is to determine the sales and profits lost to the patentee because of the infringement. Although the statute states that the damage award shall not be "less than a reasonable royalty" ... the purpose of this alternative is not to provide a simple accounting method, but to set a floor below which the courts are not authorized to go.

*Del Mar Avionics Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1326, 5 U.S.P.Q.2d 1255 (Fed.Cir.1987). In order to recover lost profits damages, "a patentee must show a reasonable probability that, but for the infringement, it would have made the sales that were made by the infringer." *Id.; see also Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 197 U.S.P.Q. 726 (6th Cir.1978). The issue of whether a court should award lost profits damages or a reasonable royalty under § 284 thus turns primarily upon the quality of plaintiffs' proof of lost profits. Neither § 284 nor controlling case law restricts the recovery of lost profits damages any further.

### 2. Arguments of the Parties on the Recovery of Lost Profit Damages

Because this court has found no authorities setting forth a well-reasoned rule on this issue, this court addresses the arguments of the parties in detail.

Kelley argues that 35 U.S.C. § 284 does not authorize a patentee to recover damages for lost sales of products not covered by the patent in suit, even when those products are covered by other patents held by the patentee. Kelley makes two basic arguments in support of its position. First, it makes the "causation" argument that plaintiffs cannot demonstrate that the infringement actually "caused" lost sales of the ADL–100, because the ADL–100 did not embody the patent in suit. Second, Kelley makes the "antitrust" argument that Rite–Hite may not use its '847 license to recover damages on the lost sales of the ADL–100, because such a recovery would constitute an extension of the patent to other devices that lie outside the limited monopoly of the patent.

This court is unpersuaded by Kelley's arguments. The cases that Kelley cites in support of its "causation" argument are distinguishable from the case at bar. Kelley's reference to *Ellipse Corp. v. Ford Motor Co.*, 461 F.Supp. 1354 (N.D.Ill.1978), *aff'd* 614 F.2d 775 (7th Cir.1979), *cert. denied* 446 U.S. 939, 100 S.Ct. 2160, 64 L.Ed.2d 792 (1980) is misplaced, because the patentee in that case, unlike Rite–Hite, manufactured no products at all during the period of infringement, leading the district court to conclude that the patentee was entitled only to a reasonable royalty and not lost profits. 461 F.Supp. at 1360–62, 1379. *Peterson Filters & Engineering Co. v. Envirotech Corp.*, 178 U.S.P.Q. 337 (D.Utah 1973) is also distinguishable. The *Peterson Filters* court declined to award lost profits damages for two primary reasons: (1) the plaintiff-licensee did not make any competing bids in several of the infringing transactions, *id.* at 343–49, and (2) in the three infringing transactions in which the licensee did make a bid, the defendants did not actually supply any infringing products, but instead supplied similarly-functioning noninfringing devices.

*Id.* at 343. Thus, the defendants in *Peterson Filters*, at worst, merely led the customer "to believe that it would be supplied with infringing apparatus." *Id.* at 344.

Although *Standard Mailing Machines Co. v. Postage Meter Co.*, 31 F.2d 459 (D.Mass.1929) and *Metallic Rubber Tire Co. v. Hartford Rubber Works*, 275 F. 315 (2d Cir.), *cert. denied*, 257 U.S. 650, 42 S.Ct. 57, 66 L.Ed. 416 (1921), support Kelley's position that lost profits damages may not be recovered on lost sales of products not embodying the patent in suit, these cases are unpersuasive. Both cases apply the pre–1946 patent damages statute which provided for the recovery of an *infringer's* profits rather than the patentee's damages. In addition, the holdings of these cases are unsupported by any discernible rationale.[20] Finally, *Standard Mailing Machines Co.* is factually distinguishable, because the court found that acceptable noninfringing substitutes were available for both the patented and unpatented products for which plaintiff sought lost profits damages. 31 F.2d at 462.

The cases that Kelley cites in favor of its "antitrust" argument are also inapposite. *Leitch Mfg. Co. v. Barber Co.*, 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938), *Carbice Corp. v. American Patents Development Corp.*, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 (1931), and *Velo–Bind, Inc. v. Minnesota Mining & Mfg. Co.*, 647 F.2d 965 (9th Cir.), *cert. denied*, 454 U.S. 1093, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) merely stand for the proposition that a patentee may not recover lost profits on lost future sales of *unpatented* consumables that would have followed the sale of the patented device. *E.g., Velo–Bind*, 647 F.2d at 972; *Carbice Corp.*, 283 U.S. at 33, 51 S.Ct. at 336. These cases do not pertain to the proper measurement of damages for patent infringement; instead they state only that a patentee may not tie the use of a patent to the use of other *unpatented* consuma-

---

**20.** The *Standard Mailing Machines* court supported its legal conclusion with little more than the following reasoning: "If the plaintiff was in the market in competition with the defendant with a machine that did not embody the patented invention, it is difficult to understand how

the plaintiff had been injured by the acts of the defendant." 31 F.2d at 462. The court thus did not meaningfully consider the patentee's right to recover lost profit damages on products not embodying the patent in suit.

bles. Here, plaintiffs seek damages for lost sales of another of their patented machines, not unpatented consumables. *Ethyl Gasoline v. United States,* 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940) is also inapposite, because it concerns only the antitrust implications of a patentee's efforts to control the conduct of the licensee by fixing prices, which issue is not present here.

Kelley also has not explained why Rite-Hite's recovery of *lost profits damages* on lost ADL–100 sales unduly extends the patent monopoly, when Kelley concedes that plaintiffs are entitled to a reasonable royalty damages on lost ADL–100 sales (Kelley's proposed findings of fact and conclusions of law, ¶ 59).[21]

This court is also not persuaded by plaintiffs' argument that *State Industries v. Mor-Flo Industries,* 883 F.2d 1573, 12 U.S.P.Q.2d 1026 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990) authorizes the recovery of lost profits on lost sales of products covered by another of the plaintiffs' patents. In *State Industries,* State had two patents: the '377 patent claiming a method of insulating the tank of a water heater and a '543 patent claiming water heaters using the '377 construction. *Id.* at 1575. In deciding what share of the market, and consequently what share of Mor-Flo's sales should be subject to lost profits damages, the Federal Circuit stated:

> If the court is correct in its findings that the other competitors were likely infringers of *one or the other of State's pat-*

*ents,* State would have been entitled to their shares of the market on top of its own, and a correspondingly greater share of Mor-Flo's sales.

883 F.2d at 1578 (emphasis added). *State Industries* entitles Rite-Hite to recover lost profits damages on the ADL–100 only if this court assumes that Kelley's Truk Stop infringed a patent covered by the ADL–100, which has not been demonstrated.

### 3. *Decision on Lost Profits Issue*

■ This court recognizes the tension between the policy of complete compensation for infringement underlying § 284 and the antitrust policy against unduly extending the monopoly granted by the patent. Under the facts of this case, this tension is best resolved by awarding Rite-Hite lost profits damages on the lost ADL–100 sales.

The basic facts of this case can be summarized as follows. Rite-Hite and the Rite-Hite sales organizations spent great amounts of time, effort, and money to develop an entirely new vehicle restraint market. In doing so, plaintiffs invented and marketed two different patented vehicle restraint hook technologies, both of which achieved commercial success. The first was the "pivoted hook" technology used in the ADL–100, and the second was the "vertical moving hook" technology covered by the '847 patent and used in the MDL–55.

By inspecting the MDL–55 and borrowing the '847 technology, Kelley developed its Truk Stop restraint much earlier than would otherwise have been possible. As an automatically-functioning model, the Truk

---

**21.** This court recognizes, however, that permitting the recovery of lost profits damages on lost sales of items not embodying the patent in suit would enhance the value of a patent to a patentee who sells competing products covered by different patents. For example, in this case, Rite-Hite recovers lost profits damages based on both lost MDL–55 and ADL–100 sales, because Kelley's infringement of Rite-Hite's '847 patent did in fact cause Rite-Hite to lose these sales. If, hypothetically, Rite-Hite had patents covering only the MDL–55 and a third party had patents covering the ADL–100, Rite-Hite's remedy would be limited to no more than either (1) a reasonable royalty on use of the '847 patent or (2) lost profits on the lost MDL–55 sales. Thus, the fact that Rite-Hite markets both the ADL–

100 and MDL–55 does increase the value of the MDL patents to it.

This result is not necessarily inequitable or inefficient, however, because Rite-Hite's ownership of one restraint technology, such as that covered by the '847 patent, increases the value that Rite-Hite would place on a competing technology, such as the pivoted hook technology used in the ADL–100, because ownership of both patents strengthens Rite-Hite's position in the market. Thus, in this case, Rite-Hite's ownership of the pivoted hook technology in the ADL–100 would increase the value that Rite-Hite would place on its "right to exclude" use of the alternative hook technology of the '847 patent.

Stop was intended primarily to compete against Rite–Hite's similarly-featured ADL–100 unit. Kelley marketed the Truk Stop successfully, causing plaintiffs to lose 3,243 ADL–100 sales and 80 MDL–55 sales. Under these facts, this court holds that Rite–Hite's right to exclude use of the '847 patent entitled it to recover its lost wholesale profits on the lost ADL–100 sales.

Awarding Rite–Hite its lost wholesale profits on lost ADL–100 sales is appropriate for three reasons. First, such an award of lost profits damages upholds the basic statutory purpose underlying § 284, which is to afford "complete compensation" for infringement, *Aro Mfg. Co.*, 377 U.S. at 507, 84 S.Ct. at 1543; *see also General Motors Corp.*, 461 U.S. at 655, 103 S.Ct. at 2062, because Rite–Hite has shown to a reasonable probability that it would have made these wholesale profits but for Kelley's infringement. *Del Mar Avionics*, 836 F.2d at 1326. Second, such an award merely compensates Rite–Hite for the ADL–100 sales that Kelley anticipated taking from Rite–Hite when it marketed the Truk Stop against the ADL–100. The rule applied here therefore does not extend Rite–Hite's patent rights excessively, because Kelley could reasonably have foreseen that its infringement of the '847 patent would make it liable for lost ADL–100 sales in addition to lost MDL–55 sales. *See Velo–Bind*, 647 F.2d 965.[22] Third, this rule avoids the absurd result produced by the rule that Kelley urges. Under Kelley's proposed rule, Kelley could develop a machine to compete with the ADL–100 by using the '847 technology contained in the MDL–55, and conversely, develop a machine to compete with the MDL–55 by using patented technology in the ADL–100. Through such a "whipsaw" technique, Kelley could avoid paying lost profits damages for lost sales of either device, as Kelley's liability would be limited to reasonable royalty damages. Such a result would be inconsistent with the underlying policy of "complete compensation."

C. *Whether Rite–Hite has Satisfied the Panduit Test for Recovery of Lost Profits Damages*

■ In order to recover its lost wholesale profits as damages, Rite–Hite must show (1) that it would have made the claimed lost sales but for Kelley's infringement, and (2) the amount of profit that it would have made on those sales. *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1141 (Fed.Cir.1991). In proving damages, "the patent owner's burden of proof is not absolute, but rather one of reasonable probability." *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 653, 225 U.S.P.Q. 985 (Fed.Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). The patentee, therefore, "is not obliged to negate every possibility that a purchaser might not have bought the patentee's product instead of the infringing one, or might have foregone the purchase altogether." *Del Mar Avionics*, 836 F.2d at 1326. In *Panduit*, the Federal Circuit approved what has become the standard test for determining whether the patentee is entitled to lost profit damages. *Kaufman*, 926 F.2d at 1140. Under the *Panduit* test, Rite–Hite may recover lost profits damages by establishing the following: (1) demand for the patented product, (2) an absence of acceptable noninfringing substitutes, (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit the pat-

---

**22.** This court notes that the issue of whether Rite–Hite is entitled to lost profit damages or a reasonable royalty becomes moot if the court awards a royalty rate that approximates the amount of lost profits damages. The Federal Circuit has acknowledged that the amount of the royalty should be that amount that adequately compensates for the infringement, and that the court has the discretion to increase the reasonable royalty award to accomplish that compensatory purpose. *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed.Cir.1983). Other courts have awarded such high royalty rates on occasion. *See, e.g., Santa Fe–Pomeroy, Inc. v. P & Z Co.*, 212 U.S.P.Q. 417 (N.D.Cal.1980) (awarding royalty in a suit between competitors equalling 100% of profit that patent owner would have made on infringing sales). Therefore, if the lost profits damages remedy on lost ADL–100 sales were unavailable, this court would have awarded Rite–Hite a manufacturer's royalty equal to its lost wholesale profits on lost ADL–100 sales and lost ADL-leveler package sales.

entee would have made. *Panduit*, 575 F.2d at 1156.

Rite–Hite has satisfied these elements as follows: First, the substantial demand for the infringing Truk Stop satisfies the "demand" element of the test. *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552, 222 U.S.P.Q. 4 (Fed.Cir. 1984). Second, Rite–Hite has shown that nonrestraint devices, such as wheel chocks, were unacceptable, and that alternative noninfringing restraint units were unavailable to the purchasers of the infringing Truk Stop. Kelley's evidence of the mere theoretical availability of other restraint devices is insufficient to overcome Rite–Hite's proof that these alternative restraints were unacceptable or unavailable to the actual purchasers of the infringing Truk Stop. *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901, 229 U.S.P.Q. 525 (Fed. Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986). Third, Rite–Hite has also demonstrated that it possessed sufficient marketing and manufacturing capabilities to exploit the demand. Finally, as discussed below, Rite–Hite has met its burden of proving the profits they would have made.

The *Panduit* test is a "nonexclusive standard for determining lost profits," *State Industries*, 883 F.2d at 1577, and the plaintiffs have also corroborated their lost profits claim through the now-accepted market share method. *Id.* at 1578. Under the market share method, Rite–Hite would be entitled to a pro rata share of Kelley's infringing sales, based upon Rite–Hite's share of the noninfringing restraint market. *Id.* Rite–Hite's share would also include the share of the market that Serco gained with its infringing sales in addition to plaintiffs' own share. *Id.*

Although the amount of lost profits cannot be speculative, it need not be proved with unerring precision. *Bio–Rad Labs v. Nicolet Instrument Corp.*, 739 F.2d 604, 222 U.S.P.Q. 654 (Fed.Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984). When the amount of damages cannot be determined precisely, "any doubts regarding the amount must be resolved against the infringer." *Ryco, Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 1428, 8 U.S.P.Q.2d 1323 (Fed.Cir.1988). Rite–Hite adequately documented and calculated its claim for lost wholesale profits through its incremental method of accounting. Under this accepted method, *see Paper Converting Machine Co. v. Magna Graphics Corp.*, 745 F.2d 11, 22, 223 U.S.P.Q. 591 (Fed.Cir.1984), Rite–Hite calculated the total gross income that it lost as a result of the infringement and deducted from that amount the incremental expenses that it avoided by not making the infringer's sales. The plaintiffs properly did not deduct unpaid income tax from their claim. *Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1483, 16 U.S.P.Q.2d 1093 (Fed.Cir.1990). However, Rite–Hite as a retailer and the plaintiff ISO's must deduct from their claims the sales commissions that they avoided on the lost sales, because the plaintiffs have not demonstrated that they are legally obliged to pay their salespeople such commissions out of the proceeds of this case.

Rite–Hite as a manufacturer proved its lost profits to a reasonable probability, but Rite–Hite as a retailer and the ISO's have failed to meet this burden, because they failed to deduct their avoided sales commission costs. Although the plaintiffs have represented that not all the representatives in fact paid sales commissions (Plaintiffs' Reply Trial Brief at 13), those representatives have not been specifically identified. All of the Rite–Hite sales organizations, both Rite–Hite owned and ISO's, therefore failed to meet their evidentiary burden of proving lost profits, and accordingly are entitled only to reasonable royalty damages. 28 U.S.C. § 284; *Panduit*, 575 F.2d at 1156.

### D. *Plaintiffs Recovery of Damages for Lost Profits on Dock Leveler Sales*

Kelley argues that dock levelers should not be included in the royalty base or in the calculations of lost profit damages. Kelley contests the applicability of the "entire market value rule" here for two reasons. First, Kelley argues that the en-

tire market value rule should not be applied to dock leveler-restraint packages, because levelers have "economic value" independent of restraints. Second, Kelley argues that under the entire market value rule, the sales of collateral items such as dock levelers must be tied to the sale of items containing the infringed patent (MDL restraints) in order to be included in the damages award. This court rejects Kelley's arguments, because the proper test of entire market value is not whether the items have any economic value independent of the restraint, but whether the sale of levelers is highly dependent upon the sale of restraints under the standard procedure for marketing restraints.

■ The entire market value rule permits recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand. *TWM Mfg.*, 789 F.2d at 901. It is the " 'financial and marketing dependence on the patented item under standard marketing procedures' which determines whether the nonpatented features of a machine should be included in calculating compensation for infringement." *Kori Corp.*, 761 F.2d at 656 (quoting *Leesona Corp. v. United States*, 599 F.2d 958, 974, 202 U.S.P.Q. 424, *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979)). For example, in *Paper Converting Machine Co.*, the Federal Circuit affirmed the award of damages on unpatented auxiliary units which were not integral parts of the patented item and which had separate usage, because the auxiliary units operated together with the patented item to complete a single manufacturing process. 745 F.2d at 23. In establishing lost profits, "[t]he deciding factor ... is whether '[n]ormally the patentee (or its licensee) can anticipate sale of such unpatented components as well as of the patented' ones." *Paper Converting Machine Co.*, 745 F.2d at 23 (quoting *Tektronix, Inc. v. United States*, 552 F.2d 343, 351, 213 Ct.Cl. 257 (1977), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978)). Thus, if a patentee or hypothetical licensee can anticipate "an increase in sales of collateral unpatented items because of the patented device, the patentee should be compensated accordingly." *TWM Mfg. Co.*, 789 F.2d at 901.

■ Although in all previous cases the entire market value rule has been applied only in those cases in which the collateral item has been attached directly to the patented item, this court concludes that the reasoning behind these cases does not preclude application of the entire market value rule to leveler sales that would have been packaged with the ADL–100. Once this court has determined that Rite–Hite lost a very significant number of ADL–100 sales because of Kelley's infringement, it would be anomalous to include in plaintiffs' awards only the leveler sales that would have been made in MDL–55-leveler package sales, but to exclude the leveler sales that would normally have been made in ADL–100-leveler package sales. Kelley's ability to sell levelers in the package Truk Stop-leveler sales was dependent upon Kelley's use of the '847 technology: Kelley's infringement of the '847 patent permitted it to sell the Truk Stop restraint, which in turn permitted Kelley to sell a significant number of levelers.

■ This application of the entire market value rule proceeds from the overriding rule that a patentee can recover as damages all profits from lost sales upon proof that, "but for" the infringement, it would have made on the sales. *Kori*, 761 F.2d at 655. As the Supreme Court stated in *Aro Mfg.*, the essential question is: "had the [i]nfringer not infringed, what would the [p]atent [h]older-[l]icensee have made?" 377 U.S. at 507, 84 S.Ct. at 1543. This extension of the entire market value rule is justified here where: (1) plaintiffs expended significant amounts of effort and money to develop an entirely new vehicle restraint market, (2) plaintiffs developed two alternative, successful, and patented restraining hook technologies for exploiting that market, (3) both plaintiffs and Kelley normally anticipated selling levelers along with restraints in a high percentage of restraint sales, and (4) the defendant's infringement of one of the restraining hook technologies

caused the plaintiffs to lose sales of units embodying both technologies, in addition to packaged leveler sales.

### E. Reasonable Royalty

Plaintiffs are entitled to a reasonable royalty on Kelley's infringing sales on which plaintiffs are not entitled to lost profit damages. 35 U.S.C. § 284; *Bio–Rad Laboratories,* 739 F.2d at 615–16. A reasonable royalty is determined by imagining a fictitious situation in which the plaintiffs and the defendant would have "willingly" negotiated a royalty agreement at the time infringement began and then imagining what the royalty in such a situation would have been. *Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1079, 219 U.S.P.Q. 679 (Fed.Cir.1983).

The reasonable royalty rate is determined by reference to several basic guidelines. Where, as here, the plaintiffs and defendant are competitors, the patent holder will be entitled to a higher royalty rate. *Georgia–Pacific Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116, 1124, 166 U.S.P.Q. 235 (S.D.N.Y.1970), modified and aff'd, 446 F.2d 295, 170 U.S.P.Q. 369 (2d Cir.), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1972). The reasonable royalty should also be higher in this case because Rite–Hite had a policy of not licensing its competitors. *Id.,* 318 F.Supp. at 1127. Additionally, a higher rate should be awarded during the most valuable years of the life of a patent, *Pitcairn v. United States,* 547 F.2d 1106, 1117, 212 Ct.Cl. 168, 192 U.S.P.Q. 612, 618 (1976), *cert. denied,* 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978), such as at the beginning of the life of the patent, when no other competitors were present. Finally, the royalty rate should take into account the profits that the licensor would have foregone both on the lost sales of the product in competition with the licensed product and on unpatented products, such as levelers which are typically sold with the patented product. *Deere & Co. v. International Harvester Co.,* 710 F.2d 1551, 1559, 218 U.S.P.Q. 481, 487 (Fed.Cir.1983).

Applying these factors, this court finds that the royalty rates set forth in Sec. II.K of this decision are reasonable.

### F. Prejudgment Interest

Under 35 U.S.C. § 284, the trial court shall ordinarily award prejudgment interest to a patent plaintiff who is entitled to damages. *General Motors v. Devex,* 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). Prejudgment interest applies to both the award of lost profits damages as well as reasonable royalty damages. *Gyromat,* 735 F.2d at 556. The trial court has substantial discretion to determine the rate of prejudgment interest, *Kaufman,* 926 F.2d at 1144–45, and may award prejudgment interest at a simple or compound rate. *Gyromat,* 735 F.2d at 554.

Here, this court awards prejudgment interest at the prime rate on both the lost profit damages and the reasonable royalty damages. This court uses the prime rate for fixing prejudgment interest for two reasons. First, the prime rate is an easily ascertainable figure that generally "provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default." *Gorenstein Enterprises v. Quality Care–USA,* 874 F.2d 431, 436 (7th Cir.1989). This court has not received evidence on the risk of default by Kelley, and it expresses no view on this subject. This court notes, however, that the risk of default is seldom trivial, and if this court is to effectuate the congressional purpose of affording complete compensation to the patent holder, it should take such risk of default into account. The Court of Appeals for the Seventh Circuit noted in *Gorenstein:*

> The defendant who has violated the plaintiff's rights is in effect a debtor of the plaintiff until the judgment is entered and paid or otherwise collected. At any time before actual payment or collection of the judgment the defendant may default and the plaintiff come up empty-handed. The plaintiff is an unsecured, uninsured creditor, and the risk of de-

fault must be considered in deciding what a compensatory rate of interest would be.

874 F.2d at 436. Second, Rite–Hite borrowed substantial sums of money at or above the prime rate during the period of infringement (*See* PDTX–54). Thus, in this case, awarding interest at the prime rate not only compensates plaintiffs for the risk of default, but it also compensates them for the true opportunity cost of losing profits to Kelley during the period of infringement.

The interest period for each infringing sale shall run from the date of last day of the month of each infringing sale to the date of judgment.

## IV. TOTAL DAMAGES

This court orders the plaintiffs to submit proposed judgments calculating each plaintiff's damages in accordance with this order.

IT IS THEREFORE ORDERED that within fourteen (14) days of this date plaintiffs shall submit, pursuant to Fed.R.Civ.P. 58, proposed judgments consistent with this decision and order. Plaintiffs shall also submit accountings calculating each plaintiff's damages, which accountings shall make all necessary references to this decision and order.

IT IS FURTHER ORDERED that within twenty-four (24) days of this date, Kelley may submit a response to the plaintiffs' proposed judgments and accountings.